UNITED STATES of America, Plaintiff,

v.

Patricia Campbell HEARST, Defendant.

No. CR–74–364 WHO.

United States District Court,
N. D. California.

Nov. 19, 1976.

James L. Browning, Jr., U. S. Atty., F. Steele Langford, David P. Bancroft, Asst. U. S. Attys., San Francisco, Cal., for plaintiff.

F. Lee Bailey, J. Albert Johnson, Boston, Mass., Law Offices of Garret McEnerney, II, E. John Kleines, San Francisco, Cal., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

After eight weeks of trial encompassing some seventy-three witnesses and one hundred eighty-six exhibits, defendant was convicted of armed bank robbery under 18 U.S.C. § 2113(a), (d) and use of a firearm to commit a felony under 18 U.S.C. § 924(c). Sentence having been imposed, defendant now brings this motion for a new trial on grounds of "newly discovered evidence". The allegation is essentially that the government violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

At trial, defendant admitted commission of the offenses charged yet interposed the defense of coercion, arguing that her actions were the involuntary results of duress applied by her alleged captors, the Symbionese Liberation Army (SLA). In an effort to rebut the coercion defense, the government was permitted to introduce evidence of defendant's conduct subsequent to the bank robbery to show that defendant was in fact a voluntary participant in the revolutionary activities of her purported captors. Toward this end the government called Anthony Shepard, store clerk at Mel's Sporting Goods, as a trial witness, and it is his testimony to which the instant motion pertains.

The substance of Shepard's testimony was that on May 6, 1974, he attempted to arrest Bill and Emily Harris for shoplifting at Mel's Sporting Goods. Outside the store a scuffle ensued, and the attempted arrest was thwarted by a burst of gunfire from the automatic weapon held by a white female sitting in a red van parked nearby. Realizing that he was being fired upon, Shepard hid behind a concrete street light pole, which pole was thereupon hit by bullets. As the van (with the Harrises now inside) fled the scene, Shepard began pursuit in his brown Mazda. The van stopped at Ruthelen Street, and the white female who had fired at Shepard exited the vehicle and walked toward him with her weapon at port arms. Shepard put his car in reverse and backed up to protect himself. At this point,[1] the Harrises also exited the van and proceeded toward a Pontiac automobile parked nearby. Leaving the van behind, the Harrises and the white female entered and fled in the Pontiac.

Although Shepard could not positively identify defendant Hearst as the white female suspect, he was certain that the white female was neither of the Harrises. At trial, defendant admitted that she was the only other person with the Harrises on that occasion and that she was armed and alone in the van from which the shots were fired that "rescued" the Harrises. Shepard had thus effectively, though not positively, identified Hearst as the white female assailant. Although defendant did not dispute the fact that she fired at Shepard as he hid behind the concrete light pole, she did claim at trial that it was Bill Harris and not herself who later advanced toward Shepard's brown Mazda with machine gun at port arms.

As it turns out, there were two other witnesses to at least part of the sequence reported by Shepard. The Pontiac in which Hearst and the Harrises ultimately fled was owned and occupied by Kenneth Pierre and his sister Marva Davis. Just as the van carrying the three suspects, in flight from the pursuing Shepard, passed Pierre's Pontiac, Pierre pulled his car over to the side of Ruthelen Street. The van stopped, the Harrises exited and walked over to force Pierre and Davis from the Pontiac in which they were still sitting. As indicated, the three suspects then entered and fled in that Pontiac. Although Pierre and Davis did not testify at trial, the government pos-

---

1. At trial, the following exchange occurred on direct examination of Anthony Shepard:

 "Q. All right, incidentally, had you seen either William or Emily Harris get out of the van prior to the time you saw this individual walking down toward you?

 A. No, sir."

sessed, prior to and during trial, statements Pierre and Davis made to authorities after the events of May 16, 1974. Based on the fact that these statements were not provided to the defense during trial, defendant claims that the government violated its constitutional obligations under *Brady.*

Preliminarily, it is important to specify which relevant statements were possessed by the government during trial and which of those statements were transmitted to defendant after direct examination of Anthony Shepard, as required by 18 U.S.C. § 3500. The parties have stipulated to the facts in this regard.

The government delivered to defendant, one day in advance of Shepard's direct testimony, all of Shepard's prior statements in its possession; this included so-called "302" statements by Shepard to the Federal Bureau of Investigation (FBI), as well as Shepard's testimony before the Los Angeles grand jury.[2] On the other hand, the government did *not* deliver to defendant the four statements of Pierre and Davis which it possessed—three "302" statements and a Los Angeles County Sheriff's Office report.[3]

In effect, the government voluntarily turned over to defendant, in response to her general *"Brady"* request, massive materials, including reports, records, documents, and all of defendant's known statements in the government's possession. Of the materials delivered to defendant, FBI reports

alone totalled some 3,300 pages; a complete set of documents seized at the time of arrest, comprising approximately 1,200 pages, was voluntarily furnished to defendant as well. Thus, the government was, on the face of things, hardly begrudging in its disclosure. In sum, the precise issue for decision here is whether nondisclosure of the four statements by Pierre and Davis contravenes *Brady* so as to require a new trial.

Defendant bases her *Brady* violation claim on the view that these Pierre and Davis statements corroborate her own testimony that it was Bill Harris and not herself who advanced toward Shepard's brown Mazda with machine gun at port arms; thus, defendant argues that the withheld statements are irreconcilable with the trial testimony of Shepard and are, therefore, "exculpatory". Since the government contends that the withheld Pierre and Davis statements are quite consistent with Shepard's testimony, the question of consistency is quite material to the determination of this motion.

The Los Angeles Sheriff's Office statement of both Pierre and Davis indicates that, at the time in question, Bill and Emily Harris exited the van brandishing automatic weapons and walked toward Pierre's Pontiac, at which point Bill Harris said to Pierre: "We're SLA, we need your car; I have to kill some son-of-a-bitch, and I don't want to kill you." In fear of their lives,

**2.** In some of her moving papers defendant claimed that the government possessed but withheld a May 20, 1974, statement of Shepard to the Inglewood police. At oral argument of the instant motion, prosecutor James L. Browning indicated that the government did *not* possess this statement during trial, and that the government did possess a May 17, 1974, statement of Shepard to the Ingelwood police which the government *did* deliver to the defense. Defense attorney F. Lee Bailey did not pursue the matter, indicating at oral argument that all statements of Shepard possessed by the government were in fact turned over to defendant at the proper time and that defendant was basing her motion entirely upon the withheld statements of Pierre and Davis.

**3.** At one point defendant claimed that the government possessed but withheld the Los

Angeles grand jury testimony of Pierre and Davis. The government claims not to have possessed this testimony during trial, and there is no evidence to the contrary. In fact, in its latest, supplemental brief (dated November 9, 1976) and at oral argument, defendant apparently acquiesced in this view. Therefore, this motion is based solely on the "302" and Los Angeles Sheriff's Office statements of Pierre and Davis.

It should also be noted that Davis was interviewed twice by the FBI subsequent to the events of May 16, 1974, resulting in two essentially identical "302" reports—one transcribed on May 17, 1974, and the other on May 23, 1974. The third "302" report involved here concerns the statement of Pierre transcribed on May 21, 1974.

Pierre and Davis exited their Pontiac running; the last thing they saw was the Harrises being handed weapons from the van by an unidentified third suspect.

The relevant portion of the May 16, 1974, "302" statement (transcribed on May 21, 1974) by Pierre is as follows:

"PIERRE stated that prior to stopping his vehicle to let his sister out, he observed, through his rear view mirror, a red Volkswagen van traveling southbound on Ruthelen Street directly behind him, and it appeared to him that the van was in a hurry to pass him. He stated he pulled to the west side of Ruthelen and the van passed him and continued south for approximately thirty feet and stopped. PIERRE again directed his attention to his sister and was only vaguely aware that two persons had gotten out of the van and were walking toward his vehicle. He stated these individuals were white, one male and the other female. As the male walked up to his side of the vehicle he observed he was carrying a carbine rifle. The male then advised him that he was a member of the Symbionese Liberation Army and announced that he was in need of PIERRE's 1970 Pontiac. The male then ordered PIERRE out of the vehicle. PIERRE stated he momentarily hesitated whereupon the male stated, 'I don't want to kill you' and he turned to the female who was now standing on the passenger side of the Pontiac, and said, 'I'm going to kill that son of a bitch'.

PIERRE stated that at first he was not sure whether the male was talking about him or another individual and hastened to remove himself from his vehicle on the driver's side. MARVA DAVIS alighted from the Pontiac on the passenger side.

At that point the two individuals appeared to have no further interest in PIERRE or DAVIS, so DAVIS and PIERRE walked toward the residence of DAVIS' friend. PIERRE stated that he casually looked over his shoulder while walking and observed that the female had gotten behind the steering wheel of the Pontiac. The male, who had walked toward the van, returned to PIERRE's Pontiac and took the driver's position. The female then moved to the passenger side of the Pontiac. The male then drove the Pontiac alongside the right side of the van. PIERRE observed one or more pairs of hands, which he believed were men's hands, hand two pistols from the van to the unknown male behind the steering wheel of the Pontiac. Thereafter he observed several other packages of varied and assorted sizes passed from the van to the Pontiac. He stated that he believed that the hands were white but he was not absolutely certain. He added that one of the pistols passed into the Pontiac was encased in a brown holster."

The Davis "302" report of May 16, 1974 (transcribed on May 17, 1974), contained the following description of events:

"As [the Harrises] approached the PIERRE automobile, the male confronted her brother KENNETH, and stated something to the effect, 'We're with the SLA. I don't want to shoot you. I need your car'. At this time Mrs. DAVIS immediately exited the automobile and walked directly to the SMITH residence. As she walked toward the house she heard the male say, 'I'm going back to kill that son of a bitch', and observed him walking in a northerly direction. She does not remember seeing him return, but noted the female positioned herself as the driver of the car and the male entered the passenger side. She could not account for any remarks or utterances on the part of the female. Although she did not personally see the couple leave, she stated that a discussion of the incident with her brother and other persons revealed the couple probably fled south on Ruthelen Street."

Again, defendant's argument is essentially this: since both Pierre and Davis heard Bill Harris say, "I'm going to kill that son-of-a-bitch" and since Davis saw Harris thereafter walk in a northerly direction (i. e., in the direction of Shepard's brown Mazda), the views of these two witnesses contradict Shepard's trial testimony and cor-

roborate defendant's own trial testimony that it was *Harris* who advanced toward Shepard's car with weapon at port arms.

The government, on the other hand, contends that the recollections of Davis are not inconsistent with Shepard's trial testimony because two separate time sequences were involved—Shepard saw Hearst advance toward him *prior to* the time he saw the Harrises exit the van and walk toward the Pontiac in which Pierre and Davis were seated. Since Pierre and Davis were at best "vaguely aware" of the Harrises approaching their Pontiac, it is clear, the government argues, that these witnesses simply failed to observe Hearst's advance on Shepard. The government claims that its view of the sequence is bolstered by the fact that, according to Shepard, Hearst had *already completed* her advance toward him *before* the Harrises approached Pierre's Pontiac; this is quite consistent with Davis' statement that Harris' threat to "go and kill that son-of-a-bitch" was made *as or after* Harris approached and confronted Pierre and Davis in the Pontiac. Essentially, the government claims that *both* Shepard and Davis are correct as to what happened—*first,* Hearst advanced on Shepard (unbeknown to Davis) and *then* Harris made his threat and alleged northerly move.

■ The recent Supreme Court case of *United States v. Agurs,* 427 U.S. 97, 96

S.Ct. 2392, 49 L.Ed.2d 342 (1976), indicates that where, as here, a general request for "all *Brady* material" is made:

> " * * * If there is a duty to respond to a general request of that kind, it must derive from the *obviously exculpatory* character of certain evidence in the hands of the prosecutor." *United States v. Agurs, supra,* at 107, 96 S.Ct. at 2399. (Emphasis added.)

Without doubt, the Pierre and Davis statements involved here do not fit within the term "obviously exculpatory". The awareness of Pierre and Davis, *prior* to the point at which the Harrises approached their Pontiac, was too "vague" to effectively call into question Shepard's testimony that, in the interim, Hearst had advanced toward him. Only two of the four Pierre/Davis statements indicate that Harris walked in a northerly direction after uttering his threat; and these two, virtually identical statements of Davis do not indicate how far north Harris walked or, for that matter, anything else about Harris' movements which would serve to contradict Shepard's testimony. Indeed, Pierre's more detailed report of the incident indicates that, in fact, Harris did not walk northerly, but proceeded back to the van.[4] The government's view that the Pierre/Davis statements are not irreconcilable with Shepard's trial testimony is far more credible than defendant's opposing view. In fact, the many and de-

---

4. Davis' subsequent testimony before the Los Angeles grand jury indicates that she was probably mistaken about the direction in which Harris walked and that she, as well as Pierre, in fact saw Harris walk back toward the van rather than toward Shepard's car:

> "A He said he was going to back to kill that son of a bitch. That is what he said.
> Q Which direction did he go?
> A He started north on—
> Q He went in the direction from which they had come; is that correct?
> A That's correct."

Since the government did not *possess* Davis' grand jury testimony during the Hearst trial, they, of course, cannot now argue that the Pierre/Davis statements at issue here were withheld from defendant because Davis' grand jury testimony proved them not to be "exculpatory". Nevertheless, the grand jury testimony does indicate that defendant is blowing Davis'

use of the word "northerly" way out of proportion by largely basing this entire motion on Davis' use of that word in two of the four nondisclosed statements. In this light, it is difficult to view the withheld statements as, in fact, "exculpatory".

Defendant also argues that the Pierre and Davis statements indicate that the Harrises exited the van *immediately* after the van stopped, so that Hearst could not have exited and approached Shepard in the interim. I find defendant's reading of the statements strained in this regard as well; the Pierre and Davis statements simply do not exclude the possibility that Hearst made her "advancement" toward Shepard *before* the Harrises approached the Pontiac and, therefore, *before* Pierre and Davis became entirely aware of what was going on around them. Again, defendant's contentions fail to establish the withheld statements as "exculpatory".

tailed ways in which the withheld statements dovetail with Shepard's testimony, if anything, corroborate that testimony and bolster Shepard's reliability as a witness.[5] The Ninth Circuit has often held nondisclosed material not to be violative of *Brady* where the material was facially reconcilable or not necessarily inconsistent with the evidence of guilt. *United States v. Palmer,* 536 F.2d 1278 (9th Cir. 1976); *Fields v. Alaska,* 524 F.2d 259 (9th Cir. 1975); *United States v. DePalma,* 461 F.2d 240 (9th Cir. 1972); *United States v. Durgin,* 444 F.2d 308 (9th Cir. 1971).

Thus, the Court does not believe that Davis' and Pierre's statement would have even impeached Shepard's trial testimony. Even *had* Shepard's trial testimony been impeached in this manner, however, a new trial is not mandated. Every effective prosecution witness can be said to contribute at least somewhat to ultimate conviction. Thus, possible impeachment of *any* prosecution witness could be argued to diminish chances of conviction. Yet while potentially impeaching evidence *may* be "exculpatory" for *Brady* purposes, it is not automatically so. *See, e. g., Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1971); *also see, Moore v. Illinois,* 408 U.S. 786, 795–797, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1971).

In this case, even had Shepard's testimony been impeached as to Hearst's "advancement" (which testimony was weak anyway because of Shepard's inability to *affirmatively* identify the defendant), his testimony as to Hearst's prior machine gun fire would have remained strong—Pierre's and Davis' statements have no relevance to this aspect of Shepard's testimony, and Shepard's overall weak identification of the defendant is virtually immaterial here because Hearst was admittedly armed and alone in the van from which the gunfire issued. .Thus, by far the most damaging portion of Shepard's testimony as to defendant's voluntariness would not have been shaken in the least by any impeachment via the Pierre/Davis statements.

The Supreme Court in *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1971), indicated that:

"The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is *favorable* to the accused and is *material* either to guilt or to punishment." (Emphasis added.)

*Also see, Fields v. Alaska,* 524 F.2d 259 (9th Cir. 1975). The "favorability" requirement has already been discussed, and the Court has concluded that the withheld evidence was not "obviously exculpatory". In addition, the Court finds that the withheld evidence was not "material", a standard which the Supreme Court has defined in terms of "reasonable doubt":

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows

---

**5.** Shepard's testimony regarding the sequence of events beginning with his pursuit of the van in his brown Mazda vacillated somewhat. His Los Angeles grand jury testimony (delivered to defendant at trial) was not entirely consistent with his eventual trial testimony. For example, before the grand jury he was unable to say whether the person approaching with machine gun at port arms was male or female. In addition, in his first FBI interview with Agent Kiley ("302" report, May 16, 1974), Shepard apparently identified the approaching individual as a male who, by description, *could have been* Bill Harris. The defense was delivered a copy of this interview and cross-examined Shepard about it extensively at trial. In subsequent interviews (see, for example, the May 17,

1974, "302" report of FBI Agents Curry and Orr), Shepard identified the approaching individual as the woman who had fired at him from the van—presumably defendant Hearst. Since defendant had ample opportunity to cross-examine Shepard respecting his prior inconsistent statements, and since his other statements about the incident *were* consistent with this trial testimony, I find that Shepard's alleged vacillations do not establish the Pierre and Davis statements as "exculpatory". These statements would not have impeached Shepard any more than he was *in fact* impeached by his own prior inconsistent statements. Indeed, Pierre and Davis might have, as discussed, bolstered and corroborated Shepard's testimony.

that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *United States v. Agurs, supra,* at 112, 96 S.Ct. at 2401.

As is further discussed below, the evidence on defendant's voluntariness was massive, and of this evidentiary block, Shepard's testimony regarding Hearst's "advancement" was but the weakest chip. In the Court's view, this chip of evidence was entirely cumulative, such that its absence could not have changed the jury's necessary position on the issue of coercion. Thus, the Court finds that there would still have been no reasonable doubt about guilt even had Shepard's "advancement" testimony been impeached or excluded. *See, United States v. Agurs, supra,* at 112, 96 S.Ct. 2392. This lack of materiality bolsters the conclusion that the Davis/Pierre statements cannot be characterized as "exculpatory" much less "*obviously* exculpatory". If there is anything "obvious" about these statements, it is that the government properly viewed them as consistent with Shepard's testimony and cumulative thereto. Pierre and Davis were not used as trial witnesses for the same reason that their statements were not turned over to the defense—the substance of those statements went entirely to the conduct of the Harrises and had, ostensibly, no bearing at all on defendant Hearst.[6]

In *Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 766, the Supreme Court wrote:

" * * * We do not, however, automatically require a new trial whenever 'a

combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict * * *.' "

Again in *United States v. Agurs, supra,* at 109, 96 S.Ct. at 2400 the Supreme Court indicated that:

" * * * there is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."

Ordinarily, the instant motion could be denied upon the Court's ruling that the constitutional standards of *Brady* and *Agurs* have not been transgressed. However, on December 19, 1975, Judge Carter issued an order aimed at settling discovery disputes between the parties and at defining the government's *Brady* obligations. In that order, Judge Carter made clear his expectation that the government would deliver all "*arguably* exculpatory evidence" to the defense, including "any evidence that *may tend to impeach* the testimony of a Government witness and thereby exculpate the defendant". *United States v. Hearst,* 412 F.Supp. 863, 867 (N.D.Cal.1975) (emphasis added). Judge Carter's "arguably exculpatory"—"tend to impeach" standard appears broader than the "obviously exculpatory" measure of *Agurs.* On this basis, defendant argues that the government's failure to deliver the Pierre/Davis statements violated Judge Carter's order and now entitles her to a new trial.

However, the Court need not decide whether the government's nondelivery vio-

---

**6.** The four Davis/Pierre statements are also not entirely consistent with one another. In fact, Davis and Pierre had so little attention on the situation *before* the Harrises approached the Pontiac, and left the scene so quickly *after* the Harrises reached the Pontiac, that their testimony would, in all likelihood, have been virtually worthless to *either* side in the Hearst trial.

Indeed, it seems that the Davis/Pierre statements are "of such vague and uncertain quality that [they] cannot be said to fall within the suppression rule" of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *United States v. DePalma,* 461 F.2d 240, 241 (9th Cir. 1972).

lated Judge Carter's order because, even if it did, the violation was unintentional and the error was harmless. Since the Court has already determined that the government's withholding of the Pierre/Davis statements did not violate *Brady* (as further explained in *Agurs* ), the government's alleged violation of Judge Carter's order cannot possibly rise to constitutional proportions. Therefore, the rigid test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1966), need not be met and the less onerous, statutory "harmless error" standard applies. *See,* Fed.R.Crim.P. 52(a); 28 U.S.C. § 2111. Although it may seem unnecessary to force the government to meet a lesser standard when they have already satisfied a greater one, discussion of the "harmless error" rule here enables the Court to more fully set forth the relative significance which the withheld statements might have occupied in this case.

■ The federal "Harmless Error" Rule (Fed.R.Crim.P. 52(a)) provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." *See also,* 28 U.S.C. § 2111. The standard applicable to nonconstitutional error was developed by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946):

> "If, when all is said and done, the * * [court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, * * *. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

*See also, United States v. Arias-Diaz,* 497 F.2d 165 (5th Cir. 1974). Coercion and voluntariness were, indeed, major issues at trial. Yet it must be recalled that they were major because *defendant* made them so. Thus, defendant admitted commission of the offenses charged and *chose* to rest her case upon the defense of coercion. It was at *defendant's* behest that the trial focus shifted from the criminal acts alleged in the indictment to her overall conduct and state of mind. Therefore, it may well be that defendant's admission of the bank robbery counted for much more in the jury's mind than the number of pages it occupied in the trial transcript.

Whereas the importance of the coercion issue appears somewhat overstated by the defendant, the centrality of Shepard's "advancement" testimony *to* that issue stands even more exaggerated by the defense.

■ Preliminarily, Shepard testified at a hearing held outside the presence of the jury to determine:

> " * * * whether certain incriminating statements made by [defendant] subsequent to the time of the offense here charged were voluntary or the product of coercion or duress, irrespective of their truth or falsity." *United States v. Hearst,* 412 F.Supp. 880, 881–882 (N.D. Cal.1976).

Defendant claims that Shepard's testimony was so crucial to Judge Carter's ultimate determination that her statements were voluntary, that the withheld Pierre and Davis statements would have made the difference in his decision. In his decision, Judge Carter admitted that "the factual question presented here is a close one" but that:

> " * * * when the testimony of the defendant is balanced against that of the Government's key witnesses on this matter, Tom Matthews and Anthony Shepard, neither of whom had any apparent motive for failing to tell the truth, it appears more likely than not that the statements in issue were voluntary." *United States v. Hearst, supra,* 412 F.Supp. at 883.

Nevertheless, after reviewing Judge Carter's decision as a whole, the Court concludes that aside from Shepard's "advancement" testimony there was enough evidence to support Judge Carter's result and that the inclusion of such testimony did not, by itself, have substantial influence.

First, it is unlikely that the Pierre/Davis statements would have impeached Shepard because, as discussed, Shepard's testimony was not inconsistent with those statements. Yet even *had* Shepard's testimony as to Hearst's "advancement" toward him been impeached, his testimony that she fired at him would have remained strong. It is evident that Judge Carter relied, in making his determination as to voluntariness, more heavily on Shepard's "gunfire" testimony than upon his "advancement" testimony, partially because Shepard's identification of Hearst as the person "advancing" left some (though admittedly little) doubt. In addition, Judge Carter's determination of voluntariness rested squarely on the strong testimony of Tom Matthews as well as on defendant's own cross-examination testimony (which "evidenced the relative freedom she enjoyed while in the company of her erstwhile captors, the Harrises"). *United States v. Hearst, supra,* 412 F.Supp. at 884. Finally, despite defendant's protestations with respect to the importance of Shepard's "advancement" testimony, at the aforementioned hearing, defense counsel Bailey did not cross-examine Shepard on the matter and did not question the defendant about the incident on direct examination. In sum, the government's failure to deliver to defendant the Pierre/Davis statements was harmless error in the context of Judge Carter's determination of voluntariness because the nondelivery did not prejudice or affect substantial rights and because, in this regard, the *Kotteakos* standard was not violated.

■ With respect to the impact of Shepard's testimony on the issue of voluntariness at trial, again, it is unlikely that Pierre's and Davis' statements would have impeached Shepard because, as stated, they were not facially inconsistent. Indeed, there is an equal possibility that Pierre and Davis would have corroborated and solidified Shepard's view. Furthermore, defendant possessed at trial certain apparently inconsistent statements which Shepard made prior to trial to FBI Agent Kiley and the Los Angeles grand jury (*see,* footnote 5, *supra*). Shepard was cross-examined extensively with respect to these prior statements, and it is most unlikely that the Pierre/Davis statements could have aided defendant any *further* in her attempts to impeach Shepard. In fact, again, Pierre and Davis could very well have *undercut* the impeachment efforts by corroborating the details of Shepard's testimony. In addition, Shepard's prior statements and Los Angeles grand jury testimony (which defendant *was given* by the government at the proper time) revealed the existence of Davis and Pierre as witnesses to the event. Thus, defendant clearly knew about and could have subpoenaed Davis and Pierre as trial witnesses.[7] In fact, there is uncontroverted evidence that defense investigators contacted Davis, who declined to cooperate. Again, the subpoena was available but not utilized. Defendant's view as to the actual significance of Davis' and Pierre's potential testimony becomes apparent when viewed in this light.

*In any event,* review of the trial record shows that, due principally to cross-examination regarding prior inconsistent statements, Shepard's "advancement" testimony was probably the *weakest* bit of evidence bearing on voluntariness. Nevertheless, even assuming that Shepard's "advance-

---

**7.** In this regard, the Pierre and Davis statements are hardly classifiable as "newly discovered" evidence since the trial testimony of Pierre and Davis could have, with due diligence, been procured via court process. *See, e. g., United States v. Costello,* 255 F.2d 876 (2d Cir. 1958). This is particularly true since the testimony of Pierre and Davis would have, in terms of impeaching effect, been at best cumulative to Shepard's own prior inconsistent statements. *See, e. g., United States v. White,* 168 U.S.App.D.C. 309, 514 F.2d 205 (1975); *Pitts v. United States,* 263 F.2d 808 (9th Cir. 1959); *United States v. Jacquillon,* 469 F.2d 380 (5th Cir. 1972), *cert. denied,* 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1972).

ment" testimony had been thoroughly undermined by Davis' and Pierre's statements, the *remaining* trial evidence on the issue of voluntariness consisted of the following: the verve and alacrity of defendant's movements during the bank robbery (vividly captured on film); the apparent sincerity of her revolutionary taped messages, released by the SLA during her alleged "captivity"; defendant's matter-of-fact statements to witness Matthews that her role in the robbery had been voluntary and that her alleged captors were now "comrades"; indications on cross-examination of defendant that she enjoyed relative freedom during her alleged "captivity"; SLA documents chronicling revolutionary escapades, a major portion of which defendant admitted having written; the admitted clenched fist salutes given by defendant after her arrest; defendant's utterance of revolutionary slogans to her friend Trish Tobin in jail; and, finally, defendant's effective admission that she was armed and *alone* in the van when she fired at Shepard to rescue the Harrises from Mel's Sporting Goods.

When this abundance of evidence is added to the fact that defendant was convicted of armed bank robbery (*not* of "advancing" toward Shepard, one month later, with machine gun at port arms) in a trial consuming eight weeks, seventy-three witnesses, and one hundred eighty-six exhibits, it becomes clear that even *absent* Shepard's "advancement" testimony, there was enough evidence to *support* the verdict and that inclusion of this testimony did not have substantial influence *on* the verdict. As discussed above in connection with the materiality requirement of *Brady,* there is not even a *reasonable doubt* that thorough impeachment of Shepard's "advancement" testimony would not have changed the result. Moreover, it must be remembered that the thrust of this motion goes only indirectly to Shepard's testimony; the motion focuses upon statements of Pierre and Davis which, at the very best, only *arguably* impeach Shepard's view. Thus, defendant's argument here is built upon the weakest of inferential chains. Defendant claims that the Pierre/Davis statements clearly impeach Shepard, that Shepard was the key witness on voluntariness, and that voluntariness was *the* issue at trial. In fact, the importance of the voluntariness issue is overstated by defendant; Shepard's "advancement" testimony was wholly cumulative on voluntariness [8] and not necessary to the verdict, and the withheld Pierre/Davis statements could have as easily corroborated Shepard as impeached him. Thus, a new trial is clearly not warranted, either under *Kotteakos* and Rule 52(a) of the Fed-

---

8. At oral argument on this motion, defense counsel indicated that Hearst hardly contravened the facts proved by the government in any respect. Thus, he argued that when Hearst *did* dispute the "advancement" testimony of Shepard, "her credibility went on the line against that man". In this way, defense counsel attempted to establish the centrality of Shepard's testimony to the issue of voluntariness. This argument works against defendant, however. The fact that the confrontation between Hearst and Shepard was the only such confrontation during the long trial points not to its centrality but, on the contrary, to its inessentiality. The point is not that Hearst controverted Shepard, but rather that she did *not* controvert the remaining, massive evidence against her on the issue of voluntariness. Again, the remaining evidence was quite sufficient, *apart from* the Shepard "advancement" testimony, to establish Hearst's voluntariness beyond a reasonable doubt.

Defendant also attempts to prove the centrality of Shepard's "advancement" testimony by contending that the prosecutor, in his final argument to the jury, characterized this testimony as "the most crucial segment of circumstantial evidence in the entire case". A reading of the prosecutor's final argument indicates, however, that this characterization was directed at the "events at Mel's Sporting Goods store and the following day and night in Los Angeles on May 16 and 17 of 1974". These events included the alleged "advance" of defendant toward Shepard on Ruthelen Street; however, they *also* included (and more importantly so) defendant's admitted gunfire at Shepard from the van and defendant's apparently unequivocal expressions of voluntariness to Tom Matthews. Thus, the prosecutor's remarks do not establish the centrality of Shepard's "advancement" testimony; to the contrary, his remarks attempt to establish as crucial, at least in part, those evidentiary aspects of Hearst's willing cooperation with the SLA which she did *not* dispute but chose, rather, to explain.

**318**

eral Rules of Criminal Procedure, or under the stricter standards of *Brady v. Maryland.*

 As an independent ground for new trial, defendant argues that the government's use of Shepard as a trial witness constituted prosecutorial misconduct because, putting Shepard's prior inconsistent statements together with the statements of Pierre and Davis, the government had reason to suspect that Shepard's trial testimony was "false". In this regard, defendant cites *Imbler v. Craven,* 298 F.Supp. 795 (C.D.Cal.1969), and *Rhinehart v. Rhay,* 440 F.2d 718 (9th Cir. 1971). However, the actions of the government in this case do not even *approach* the level of prosecutorial misconduct required by those cases as prerequisite to a new trial. In this case, defendant, as well as the government, possessed copies of Shepard's prior inconsistent statements to FBI Agent Kiley and the Los Angeles grand jury. As stated, Shepard was extensively cross-examined with respect to these statements at trial. Certainly, a prosecutor's use of a witness who has made prior inconsistent statements cannot and does not, in and of itself, constitute "knowing use of false evidence", particularly where, as here, defendant had access to those statements and where, as here, the witness' remaining prior statements were essentially consistent with his trial testimony. There is no evidence in this case that Shepard's trial testimony was anything but a truthful account of his recollection. In addition, the Pierre and Davis statements do not render Shepard's trial testimony "suspect". As discussed, these statements were ostensibly consistent with and cumulative to Shepard's testimony and the prosecutor reasonably viewed them as such. In fact, the very case cited by defendant, *Rhinehart v. Rhay, supra,* defeats her claim. In *Rhinehart,* a principle government witness (Miller) had made several inconsistent statements prior to trial, with respect to which he was apparently cross-examined. Defendant moved for a new trial on the ground that certain police and juvenile reports respecting Miller had not been turned over to the defense at trial; essentially, defendant argued that alleged suppression of these reports rendered the government's utilization of Miller a "knowing use of false evidence". The Ninth Circuit denied the new trial motion because it found, first, that Miller's testimony was *not* in fact "false" (despite the prior inconsistent statements) *and,* second, that knowledge by the defense of the undisclosed reports would have been helpful only to the extent that those reports impeached Miller's testimony and *further* questioned his credibility when, in fact, his credibility had *already* been substantially brought into question.

Here, Shepard's testimony was clearly not "false", and the government was clearly not reckless or even negligent in its use of that testimony. The Pierre and Davis statements would probably not have impeached Shepard and, in any event, would almost certainly not have impeached him in any way or to any extent not *already* accomplished by cross-examination based on his prior inconsistent statements. Therefore, the Court finds no trace of "knowing use of false evidence" or suppression of evidence or other prosecutorial misconduct in this case. Defendant's motion in this regard is without basis; in fact, the massive materials which the government did deliver to defendant stand as strong evidence of the government's good faith throughout this prosecution.