UNITED STATES of America, Plaintiff,

v.

Patricia Campbell HEARST, Defendant.

No. CR–74–364 WHO.

United States District Court,
N. D. California.

Nov. 7, 1978.

G. William Hunter, U. S. Atty., Edward P. Davis, Jr., Asst. U. S. Atty., San Francisco, Cal., for plaintiff.

George C. Martinez, San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

Patricia Campbell Hearst (herein "petitioner" or "defendant"), who is currently serving the remainder of a seven-year sentence for armed bank robbery, moves this Court, pursuant to 28 U.S.C. § 2255,[1] for an order vacating, setting aside, or correcting her sentence or, in the alternative, for an order reducing her sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. For the reasons hereinafter set forth, the motions, and each of them, are denied. In considering petitioner's application, it is appropriate to review briefly the background of these proceedings.

### I.

During the night of February 4, 1974, petitioner was kidnapped at gunpoint from her Berkeley, California apartment. Two months later, following the repeated efforts of her parents to ransom her, she announced in a taped message that she had repudiated her former lifestyle, and was determined to "stay and fight" beside her captors, the Symbionese Liberation Army ("SLA"). Shortly thereafter, on April 15, 1974, petitioner, wielding a sawed-off carbine, took part in an armed robbery of the Hibernia Bank in San Francisco, in which three bystanders were wounded. This dramatic event was followed by a shoplifting incident in Los Angeles, at which petitioner, covering the escape of her SLA companions, riddled a sporting goods store with numerous rounds from an automatic weapon. In May, the State of California filed nineteen criminal charges against the defendant, including assault with intent to commit murder, assault with a deadly weapon, robbery, and kidnapping.

On June 6, 1974, Ms. Hearst was indicted by a federal grand jury for armed bank robbery, 18 U.S.C. § 2113(a)(d), and for using a firearm to commit a felony, 18 U.S.C. § 924(c). She remained a fugitive for fourteen months until she was apprehended in San Francisco on September 18, 1975, in an apartment which she shared with one Wendy Yoshimura. Evidence recovered from the apartment included ammunition, and so-called "bait bills" from the robbery of a bank in Carmichael, California, in which one person was killed. In addition, officers seized various SLA documents, including one called "Tania Interview," written partly in petitioner's own hand, describing her reasons for having joined the SLA, including her severe dislike for her parents and a hatred of her lifestyle. When booked upon her arrest, she stated her occupation as "urban guerrilla."

In the several months which followed, petitioner underwent extensive physical and psychiatric examination, and was declared competent to stand trial. Jury selection, which included individual, *in camera voir dire* of nearly sixty potential jurors, commenced on January 27, 1976, and was completed on February 4, 1976. The jury was then sequestered, and remained so during the entire eight weeks of the trial.

Petitioner's defense was straightforward: She alleged that she did not intend to participate in the bank robbery but did so only under the threat of bodily harm. Therefore, the question of whether or not she had the requisite intent to commit the crime became the sole issue of fact to be tried. To prove her defense, Ms. Hearst took the witness stand and told in exhaustive detail of the grueling, distasteful ordeal that she underwent with the SLA after her kidnapping, including her atrocious and outrageous mistreatment in the closet where she was kept blindfolded for days without relief. Three psychiatrists testified on her behalf that she had been coerced by the SLA, particularly the Harrises, into robbing the bank. Petitioner told of her journey across the country with Jack Scott to New York, including the time she spent in a Pennsylvania farmhouse, and of her return

---

1. 28 U.S.C. § 2255 is the equivalent of *habeas corpus* for federal prisoners. Defendant's mo-
tion will therefore be referred to as an "application" or a "petition."

west to Las Vegas. She then refused to answer, forty-two times, when queried about her activities during the period from her return to Las Vegas in the fall of 1974 until her arrest in San Francisco a year later.

In rebuttal, the government presented the testimony of two psychiatrists that she in fact knew what she was doing when she participated in the bank robbery, and that she was not coerced but performed her acts voluntarily. This testimony was supplemented with other evidence, including the testimony of Tom Matthews, one of the men whom Ms. Hearst and the Harrises had kidnapped in Los Angeles, who testified that Ms. Hearst told him of her voluntary role in the bank robbery.

In all, the jury listened to testimony from seventy-five witnesses and considered one hundred eighty-six exhibits. Within forty-eight hours after being charged, the jury returned a verdict of guilty. Simply stated, the jury apparently believed that Ms. Hearst had participated freely in the robbery and did not believe the coercion theory presented by her defense.

On September 24, 1976, this Court[2] sentenced petitioner to seven years on Count I, for armed bank robbery, and to two years on Count II, for use of a weapon to commit a felony, the sentences to be served concurrently.[3] Following two unsuccessful motions for a new trial,[4] defendant took an appeal.[5] In attacking the fairness of her trial, she objected to some six major rulings by the trial court on contested items of evidence, including: the admission of evidence relating to crimes committed after the robbery of the Hibernia Bank; the admission into evidence of the so-called "Tobin tape"; the exclusion of psycholinguistic testimony and certain taped interviews, offered on behalf of the defendant; the Court's decision requiring the defendant to plead the Fifth Amendment, if at all, in the presence of the jury; and the Court's decision to permit government experts to testify as to ultimate issues of fact. Each of these contentions was carefully considered, and rejected, by the United States Court of Appeals for the Ninth Circuit, which affirmed the conviction. *United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977). The Supreme Court of the United States subsequently denied defendant's petition for a writ of *certiorari,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

With new counsel, petitioner now moves this Court under 28 U.S.C. § 2255 for an order vacating her sentence or, alternatively, for an order reducing her sentence, pursuant to Rule 35 of the Federal Rules of Criminal Procedure.[6] She states three rea-

---

**2.** The case was tried before former Chief Judge Oliver J. Carter. Following the trial, Judge Carter, pursuant to 18 U.S.C. § 4205(c), committed the defendant to the custody of the Attorney General for the purpose of obtaining additional information concerning her mental state prior to imposing a final sentence. Before the study could be completed, Judge Carter died unexpectedly of a heart attack. In accordance with the local rules, the case was then assigned by lot to this Court to conduct, pursuant to Rule 25(c) of the Federal Rules of Criminal Procedure, such post-trial proceedings as were deemed necessary.

**3.** In reviewing the record, the Court has determined, based upon *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), which holds that a defendant may not properly be tried for both armed robbery, 18 U.S.C. § 2113(a)(d), and use of a firearm to commit a felony, 18 U.S.C. § 924(c), that defendant's sentence on Count II must be and is vacated. However, this action will have no practical effect, since the sentences are being served concurrently.

**4.** *See United States v. Hearst,* 424 F.Supp. 307 (N.D.Cal.1976); *United States v. Hearst,* 435 F.Supp. 29 (N.D.Cal.1976).

**5.** The defendant actually filed two appeals: one from her conviction (September 24, 1976), and another from the denial of her motion to reconsider denial of an earlier motion for a new trial (February 11, 1977). These appeals were consolidated for hearing by the Court of Appeals. *United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

**6.** As a supplement to these motions, petitioner requests leave, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings, to invoke further discovery. Because of its disposition of petitioner's Section 2255 motion, the Court has no occasion to address this request.

sons why the criminal justice system failed to provide her with a fair trial. First, petitioner claims that massive pretrial publicity made it impossible to select an impartial jury in San Francisco, where the case was, tried. Second, she contends that admission into evidence of a tape recording made while she was being held in pretrial detention (the Tobin tape) constituted a denial of due process. Third, she alleges that trial counsel, Mr. F. Lee Bailey, failed to render effective assistance of counsel in her defense.

█ In adjudicating motions pursuant to 28 U.S.C. § 2255, the Court is directed to "grant a prompt hearing thereon," unless "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief * * *." *See Fontaine v. United States*, 411 U.S. 213, 215, 93 S.Ct. 1461, 1462, 36 L.Ed.2d 169 (1973); *Battaglia v. United States*, 469 F.2d 686 (9th Cir. 1972), *cert. denied*, 411 U.S. 949, 93 S.Ct. 1932, 36 L.Ed.2d 411 (1973). To explicate somewhat this bald standard, Judge Mansfield has stated:

> "[A] judge is well within his discretion in denying a petition when the supporting affidavit is insufficient on its face to warrant a hearing. [citations omitted] * * * In making that threshold determination the court looks primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief." *Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974).

Accordingly, this Court has reviewed in detail not only the voluminous exhibits submitted by petitioner in support of her motion,[7] but also the prior record in the case,

including the five reported decisions, the reporter's trial transcript, and the countless papers and briefs submitted at all stages of the proceedings. On the basis of these materials, the Court finds with respect to each of petitioner's contentions, that none of the evidence offered in her behalf, even if clearly established at an evidentiary hearing, would entitle her to relief. The Court now turns to a consideration of each of petitioner's claims *seriatim*.

## II.

Petitioner's claim that pretrial publicity rendered her trial inherently unfair is grounded in the contention, made now for the first time, that pervasive media coverage of her case made it impossible to obtain an impartial jury in the Northern District of California, where her trial was held. There can be no doubt that Patricia Hearst and her captors were the subjects of the most extensive news coverage in recent history. The media fully exploited the public's fascination with the deeds of the SLA, a small band of self-avowed terrorists. For fourteen months, the group eluded a team of more than one hundred Federal Bureau of Investigation ("FBI") agents, which in the course of their pursuit interviewed over twenty-five thousand citizens, following leads from nearly every state in the nation. News articles from as far away as Thailand, Australia, Belgium and France attest to the fact that interest in these events was international in scope. Defendant has filed with the Court over two thousand pages of newspaper clippings gathered in three American cities alone. These items are a reminder of the tremendous national attention which this story received—on television, radio, and in the print media—during a period of two years.[8]

---

7. The volume of material submitted by petitioner in support of her motions has no parallel in the experience of this Court with *habeas corpus* petitions. In addition to motions and supporting memoranda totalling 180 pages, she has submitted over 2,200 pages of supporting exhibits and affidavits, all of which was recently supplemented by a copy of her request for Executive Clemency, a document of 250 pages

in length. The repetitious and often disorganized character of these materials has made the Court's task a difficult one indeed.

8. The Court notes that editors and managing editors polled by the Associated Press voted the Hearst story the top California news story of 1975—ahead of assassination attempts on President Ford in Sacramento and San Francisco, and Governor Edmund Brown, Jr.'s first

Petitioner rests her argument on the ground that news reporting of these extraordinary events was so pervasive, and had such an overwhelming impact upon members of the jury, that a "presumption" arose that her trial was unfair. She claims further that the *voir dire* conducted by the trial judge was completely ineffective to mitigate the results of this prejudice, and that certain events during the trial compounded the unfairness by reminding the jury of the prejudicial pretrial publicity.

■ It is unnecessary for the Court to consider the merits of petitioner's arguments, for her failure to raise them prior to trial or on appeal precludes relitigation here. *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); Fed.R. Cr.P. 12(b)(f). The appropriate remedy for prejudicial publicity is a motion for a transfer of venue, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.[9] No such motion having been made prior to trial, nor argued in any of defendant's subsequent attacks on her conviction,[10] she is in no position to raise it here for the first time.

■ Recent Supreme Court decisions concerning the availability of federal *habeas corpus* for the litigation of claims which should have been raised at trial persuade

this Court that consideration of defendant's claims in this proceeding would be inappropriate. *Davis v. United States, supra; Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Rule 12(b)(f) of the Federal Rules of Criminal Procedure[11] provides that failure to raise issues concerning defects in the institution of criminal proceedings constitutes a waiver thereof. Although by its express terms, the rule refers only to defects in "the institution of the prosecution" or in "the indictment or information," it has been held to encompass challenges to the selection and composition of the petit jury as well. *Shotwell Manufacturing Co. v. United States,* 371 U.S. 341, 362, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); *Frazier v. United States,* 335 U.S. 497, 503, 69 S.Ct. 201, 93 L.Ed. 187 (1948); *Fernandez v. Meier,* 408 F.2d 974 (9th Cir. 1969). Under the principles set forth by the Supreme Court in *Davis,* failure to comply with the rule prevents the issue from being raised in collateral attack pursuant to 28 U.S.C. § 2255, absent a showing of cause and some demonstration of actual prejudice arising from the alleged constitutional violation. *Davis v. United States, supra,* 411 U.S. at 242, 93 S.Ct. 1577.

■ The clear purpose underlying the rule is to insure that constitutional and other defects, which can be remedied at

year in office. Contra Costa Times, January 2, 1976.

9. The rule provides:
"The court upon motion of the defendant shall transfer the proceedings as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." Fed.R.Cr.P. 21(a) (1975).

10. *See United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Hearst,* 435 F.Supp. 29 (N.D.Cal.1977); *United States v. Hearst,* 424 F.Supp. 307 (N.D.Cal. 1976).

11. The rule provides in pertinent part:
"(b) Any defense, objection, or request which is capable of determination without

the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
(1) Defenses and objections based on defects in the institution of the prosecution; or
(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); or

\*　\*　\*　\*　\*　\*

(f) Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (c), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver." Fed.R.Cr.P. 12(b)(f) (1975).

trial, are not withheld by the defense in the hope that, should the trial result in a conviction, the error can then be unveiled in an attempt to void the proceedings. *Id.* at 241, 93 S.Ct. 1577; *Wainwright v. Sykes, supra,* 433 U.S. at 89–90, 97 S.Ct. 2497. In *Davis,* the Court articulated such reasoning as follows:

"If its time limits are followed [those of Rule 12(b)], inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult." *Davis v. United States, supra,* 411 U.S. at 241, 93 S.Ct. at 1582.

These principles were elaborated in *Wainwright v. Sykes, supra,* where the *Davis* rule was extended to deny *habeas corpus* to a defendant who claimed that an involuntary confession had been introduced at his trial. *Id.* 433 U.S. at 87, 97 S.Ct. 2497; see *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

■ These considerations compel the same results here. A timely motion for transfer of venue would have enabled the trial judge to assess the impact of news coverage in the Northern District of California, and to order appropriate relief, if necessary. In the face of defendant's silence, the court proceeded to conduct a detailed *voir dire* (*see infra*), and an eight-week jury trial, at the conclusion of which defendant was found guilty. To permit the issue to be raised at this point would reduce to nothing the considerable efforts of the jury, the trial judge, counsel for both parties, and the seventy-three witnesses who testified at the trial.

■ Defendant can escape the effect of her waiver by showing "good cause" for her failure to raise objections prior to the trial and actual prejudice resulting from the alleged constitutional violation. *Wainwright v. Sykes, supra,* 433 U.S. at 84, 97 S.Ct. 2497. However, nothing submitted by petitioner even approaches such a showing. It is clear from an examination of the record that the failure to move for a change of venue was a considered, tactical decision. Defendant's Memorandum in Support of Individual and Detailed Voir Dire, submitted on January 1, 1976, prior to her trial, states:

"The defendant has made no motion for a change of venue, since the aforementioned publicity has permeated every American community, no matter how large or how small. Nor has the defendant made a motion for a continuance based upon an inability to obtain a fair trial within the mandates of constitutional due process predicated upon the voluminous and continuing pre-trial publicity, preferring instead to determine the extent to which the defendant may have been prejudiced in her ability to obtain a fair trial through *voir dire* examination." *Id.* at 1–2.

Having made this deliberate choice, petitioner will not now be heard to complain, for it is well-settled that a decision to waive objections due to strategic considerations will not be reexamined in collateral proceedings. *Fay v. Noia,* 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Henry v. Mississippi,* 379 U.S. 443, 451–452, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

■ Nor is anything submitted by petitioner sufficient to make out a showing of prejudice actually suffered. She relies principally upon the assertion that media coverage of her case was less comprehensive in other areas of the country than in the Northern District of California, where she was tried. In support of this contention, she has submitted news clippings covering the period from September 19, 1975, to January 31, 1976, which purport to represent pretrial newspaper coverage of her

case in three major cities: San Francisco, Dallas, and Detroit. Defendant's Exhibits ID, IE, and IF. Defendant argues that because the *volume* of coverage was heavier in the San Francisco area, either of the latter two locations (or virtually any jurisdiction outside of California) would have offered defendant a better opportunity to obtain an impartial jury. But a showing of "actual prejudice" cannot rest upon speculative assertions such as these. Nor do petitioner's conclusions necessarily follow. She has presented no evidence which suggests that citizens outside of California were substantially less familiar with the celebrated facts of her case than were residents of San Francisco. Indeed, the national coverage of her story, and its domination of the media for so many weeks, make it appear unlikely to this Court that any jurisdiction could be found whose inhabitants were unfamiliar with the Patricia Hearst story. Thus, accepting all defendant says as true, this evidence is insufficient to demonstrate that her jurors were unfairly prejudiced against her.[12]

Petitioner fails even to address the issue of whether or not her failure to move for a corrective remedy prior to trial forecloses consideration of her claim here. A review of cases upon which she relies discloses that, in each one, timely motions for transfer or mistrial were made by trial counsel. *See Sheppard v. Maxwell,* 384 U.S. 333, 348, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Rideau v. Louisiana,* 373 U.S. 723, 724, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Silverthorne v. United States,* 400 F.2d 627, 631 (9th Cir. 1968).

■ Were this Court called upon to pass judgment on the merits of petitioner's claims, it would find to a certainty that the extensive *voir dire* examination conducted by former Chief Judge Carter cured any possible prejudice arising from pretrial publicity. This circuit has established rigorous

standards for the conduct of *voir dire* examinations in cases involving a significant threat of prejudice:

> "Therefore, when pretrial publicity is great, the trial judge must exercise correspondingly great care in all aspects of the case relating to publicity which might tend to defeat or impair the rights of an accused. The judge must insure that the voir dire examination of the jurors affords a fair determination that no prejudice has been fostered." *Id.* at 637–638.

*See United States v. Polizzi,* 500 F.2d 856 (9th Cir. 1974). In *Silverthorne,* the Court of Appeals set forth two criteria which must be met: (1) the questions posed on *voir dire* must not be "calculated to evoke responses which [are] subjective in nature," but must be designed "to elicit answers which provide an objective basis for the court's evaluation"; and (2) the court's examination must be directed to individual jurors. *Id.* at 638, 639.

■ Measured even by this strict standard, the trial court's *voir dire* was completely unassailable and the attack on Chief Judge Carter's *voir dire* examination completely unjustifiable. At defendant's request, jurors were examined individually, *in camera*—out of the presence of other veniremen, the press, and the public—to insure complete candor. *United States v. Hearst,* 412 F.Supp. 873 (N.D.Cal.1976). Defendant submitted a total of seventy-five proposed questions, nearly all of which were accepted and propounded by the trial judge. Over a period of several days, nearly sixty potential jurors were examined. Each was queried, slowly and deliberately, as to regular reading habits, television and radio exposure, recollection of each of the dramatic events enumerated above, conversations with friends and family concerning the case, and a litany of other pertinent matters. In some cases, jurors were asked in excess of one hundred separate questions.

12. Defendant has submitted the affidavits of six members of the jury by which she was found guilty. Not one questions the fairness of the verdict, or even suggests that pretrial publicity rendered it impossible to adhere to the trial court's instruction to decide the case on the evidence presented at trial alone. Affidavits of Mary Nieman, Helen Westin, Douglas McGregor, Philip Crabbe, Beatrice Bowman, and Bruce Braunstein.

Counsel were given the opportunity to pose, through the trial judge, additional questions. It simply cannot be gainsaid that this painstaking and deliberate process failed to produce objective data from which the trial judge and the parties could measure the impact of news reporting—indeed, this Court would be hard-pressed to recommend a single additional question which the trial judge could have posed.[13]

Nor has petitioner proffered sufficient evidence that events which allegedly occurred during the trial rendered the proceedings constitutionally unfair. Her specific claims are these: (1) that the location of the press box in the courtroom seriously distracted the jury's attention from the trial itself; (2) that remarks by the trial judge concerning the bank robbery in Carmichael were highly prejudicial; and (3) that trial counsel's cross-examination of Dr. Fort, the government's principal psychiatric witness, made the jury aware of extraneous, prejudicial information. Of course, to the extent that trial counsel's decision not to request a mistrial on these grounds constitutes a considered, tactical choice, their impact is beyond the scope of inquiry here. *Henry v. Mississippi, supra,* 379 U.S. at 451–452, 85 S.Ct. 564. But further, these rather insignificant details, even when considered cumulatively, do not approach the showing of extraneous prejudice necessary to upset the trial as constitutionally unfair. *Cf. Sheppard v. Maxwell, supra,* 384 U.S. at 342–349, 86 S.Ct. 1507 (1966).

For these reasons, the Court finds that defendant's petition, and the record in the case, conclusively demonstrate that she is not entitled to relief on her claim that prejudicial publicity rendered her trial presumptively unfair.

**III.**

The Court now turns to petitioner's claim that admission into evidence at trial of the so-called "Tobin tape" constituted a denial of due process sufficient to vitiate her conviction.

**A.**

Following her arrest on September 18, 1975, defendant was detained until trial[14] at the San Mateo County Jail, where she was permitted to receive visitors. On September 20, she was visited there by Patricia Tobin, a childhood acquaintance who described herself at trial as defendant's "best friend." The two conversed in the jail's visiting room by means of a telephone intercommunication device, while facing each other through a glass partition. According to defendant's testimony, others were present in the room during her visit with Tobin.

This conversation was monitored and recorded by jail authorities using a switchboard-type device. The supervisor of the jail testified that such surveillance is regularly conducted in certain cases—particularly those of a highly public nature or which present unique security risks—and that a previous determination had been made to record all of defendant's visits. Indeed, defendant's comments during the conversation suggest a possible awareness on her part that surveillance was taking place. The tape recording was subsequently turned over to the government, and was played to the jury during the trial.

The content of defendant's conversation with Tobin was no doubt damaging to her

---

**13.** At one point during the *voir dire,* defense counsel, apparently impatient with the deliberate manner in which Judge Carter was proceeding, asked if the individual examinations could be expedited. The judge responded in the following colloquy:

"THE COURT: * * * I am going through this detailed examination to give you, both sides, all the information that you can possibly have for the purpose of exercising your peremptory challenges, as well as challenging for cause.

MR. BAILEY: I appreciate that, Your Honor.
THE COURT: And this is one of the purposes of this detailed examination.
It is the desire of the Court to protect the right of the peremptory challenge; that has motivated me to delve into this more extensively than I have done in most any other case that I have ever tried, and I have tried many of them." R.T. 810.

**14.** On September 23, 1975, Judge Carter revoked defendant's bail.

cause. In cold and often profane language, defendant told her friend that her "politics" had changed, a fact which "creates all kinds of problems for me in terms of a defense"; that she hoped to issue a statement from a "revolutionary feminist perspective totally"; that she was angry about having been found; that she hoped to be able to aid Steven Soliah to make bail; and, finally, that she did not wish to become a "prisoner" in her parents' home.

Recognizing the damaging impact which her taped comments would surely have on the theory of her defense, defendant moved to suppress the tape as violative of her constitutional rights. At a suppression hearing on February 20, 1976, defense counsel examined the San Mateo County Sheriff and the commander of the San Mateo County Jail, both as to the techniques employed in and the purposes behind the surveillance of defendant's conversations. Judge Carter, relying principally on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), refused to suppress the tape, finding that inmates have no reasonable expectation of privacy while incarcerated. *United States v. Hearst,* 412 F.Supp. 888, 889 (N.D. Cal.1976). The tape was subsequently played for the jury, and the government was permitted to question defendant concerning her remarks to Tobin.

Following her conviction, defendant incorporated this issue as a major point in her appeal to the Ninth Circuit, arguing that use of the tape at trial violated her Fourth and Sixth Amendment rights. The Court of Appeals affirmed the conviction, rejecting defendant's argument on both grounds. With respect to her Fourth Amendment claim, the court relied upon decisions following *Katz* and *Lanza* which establish that prison surveillance does not violate the Constitution as long as undertaken "pursuant to a rule or policy with a justifiable purpose of imprisonment or prison security." *United States v. Hearst, supra,* 563 F.2d at 1345. The court deemed this rule dispositive in the light of its express finding that "the government adequately established that its practice of monitoring \* \* \* prisoner-visitor conversations was a reasonable means of maintaining prison security." *Id.* at 1346. Defendant's Sixth Amendment claim was similarly dispatched by the holding, premised upon *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 423 (1977), that no violation of the right to counsel can occur under such circumstances in the absence of formal or surreptitious interrogation of the defendant by the government itself. *Id.* at 1348.

### B.

Petitioner now asks the Court to relitigate, in this collateral proceeding, her claim that the use of the Tobin tape violated her constitutional rights. At least insofar as her claim rests upon Fourth Amendment grounds, defendant's request plainly ignores the holding of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), to the effect that *habeas corpus* relief is not available for search and seizure challenges which have been fully and fairly litigated at trial and on direct review. In support of its ruling, the Court stated:

> "While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence. The force of this justification becomes minimal where federal habeas corpus relief is sought by a prisoner who previously has been afforded the opportunity for full and fair consideration of his search-and-seizure claim at trial and on direct review." Id. at 485–486, 96 S.Ct. at 3048 (footnote omitted).

The Court of Appeals in this circuit has interpreted the rule in *Stone v. Powell* to preclude relitigation of Fourth Amendment claims which have previously been heard in *either* state or federal court proceedings. In *Tisnado v. United States,* 547 F.2d 452, 456 (9th Cir. 1976), the court declared:

"Thus, according to *Stone v. Powell,* a federal court may not grant either § 2254 or § 2255 habeas corpus relief on the basis that evidence obtained in an unconstitutional search or seizure was introduced, respectively, at a state or federal trial where the defendant was provided an opportunity to litigate fully and fairly his fourth amendment claim before petitioning the federal court for collateral relief."

Therefore, provided petitioner has had a full and fair opportunity to press her claim at trial and on appeal, she will not be permitted to retry the issue in this proceeding.

The Court finds that Ms. Hearst has been afforded ample opportunity to litigate her Fourth Amendment claim fully and fairly both in the trial court and on direct appeal from her conviction. As noted above, she was permitted to present testimony, brief and argue the point before the trial judge, and to brief and argue again to the Court of Appeals. These same points were raised in defendant's petition for *certiorari,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90, which was denied by the Supreme Court. (1978).[15]

Defendant seeks to avoid this result by arguing that further evidence, not properly developed by trial counsel or presented heretofore, would provide the basis for a meritorious Fourth Amendment claim. In substance, defendant contends that trial counsel did not argue that the jail surveillance was undertaken solely for the purpose of gathering evidence for use at trial, rather than for jail security reasons. To support her position, she relies upon two footnotes to the Court of Appeals' opinion which suggest that no such argument had been presented there.[16]

■ Petitioner's attempt to avoid the rule in *Stone v. Powell* must fail, for this aspect of her claim has already been litigated. A review of the trial transcript persuades the Court that defendant not only had a fair opportunity to establish, but that she actually attempted to establish, at the suppression hearing on February 20, 1976, that the purpose of the surveillance was to gather evidence to be used against her.[17] In addition, the Court of Appeals explicitly noted in its opinion that "the government adequately established that its practice of monitoring * * * prisoner-visitor conversations was a reasonable means of maintaining prison security." *United States v. Hearst, supra,* 563 F.2d at 1346. Finally, despite the court's characterization of defendant's position on appeal, a reading of the briefs compels the conclusion that the argument was indeed put forward.[18] Un-

15. Mr. Justice Brennan would have granted *certiorari* to hear this issue. *United States v. Hearst,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

16. *See United States v. Hearst,* 563 F.2d 1331, 1345–1346 nn. 11, 12 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

17. During the hearing defense counsel Albert Johnson examined San Mateo County Sheriff, John McDonald, as to the purposes for which the surveillance was conducted. After eliciting from McDonald his knowledge that tapes were being forwarded to the United States Attorney's office, Johnson asked:

"Well, this necessarily would be contrary to your primary purpose in recording the tapes initially, that is, for jail security purposes; is that not so, Sheriff?" R.T. 1709.

18. Defendant's appellate brief, at 54–55, states the following:

"It is respectfully submitted that the intrusions on Patricia Hearst's privacy at San Ma-

teo County jail were not justified by any real or imaginary interests in prison security. Indeed, the trial court, because of its particular view of the controlling law in this area, made no finding with respect to whether legitimate security interests were present. Testimony at trial reflected only a vague concern for the publicity attendant to defendant's case. (T. 1698, 1702). On the other hand, jail officials did act in a manner inconsistent with any real security problems. While these officials claimed a compelling need to monitor her visiting room conversations, they did not permanently detain her in a maximum security area (T. 1694), nor did they monitor or record her conversations outside the visiting area, despite the fact that the entire jail was equipped for such action. (T. 1699–1700). In fact, the monitoring that was done was performed so carelessly that for periods of time only a dead line was recorded. (T. 1696).

Even assuming that a legitimate threat to jail security existed, it is appellant's conten-

der these circumstances, no relitigation of the Fourth Amendment claim, which has twice been heard and rejected by lower federal courts, and considered an insufficient ground for grant of *certiorari* by the Supreme Court, is appropriate here.

To the extent that petitioner's challenge to the use of the tape is grounded in the Sixth Amendment, she proffers no evidence whatsoever which could support a successful claim for relief. The Supreme Court has recently made clear that the Sixth Amendment rights defined in *Massiah v. United States, supra,* do not attach in the absence of an interrogation—either formal or surreptitious—by the government itself. *Brewer v. Williams, supra,* 430 U.S. at 400–401, 97 S.Ct. 1232; *United States v. Hearst, supra,* 563 F.2d at 1348. Ms. Hearst makes no claim that her interview with Tobin was anything more than what it purported to be—a visit with a childhood friend. Therefore, her objection to the use of the Tobin tape at trial cannot form the basis for relief under any construction of the facts set forth in her petition.

### IV.

The final matter for determination is petitioner's claim that chief trial counsel, Mr. F. Lee Bailey, failed to provide effective assistance of counsel, in that (a) his alleged plans to write a book about the trial created a conflict of interest, which caused him to make tactical decisions prejudicial to the defendant; (b) counsel's pursuit of other business activities jeopardized his ability to perform properly his functions at trial; (c) he failed to investigate and prepare adequately a motion to suppress the "Tobin tape"; (d) he neglected to investigate and develop additional defenses on Ms. Hearst's behalf; (e) counsel failed to inform himself as to the facts and the law regarding the privilege against self-incrimination; (f) counsel failed to investigate the effects of pretrial publicity; and (g) he failed to communicate with defendant during the course of his representation.

### A.

Preliminarily, it should be noted that the standard by which the Court must measure defendant's claims of ineffective assistance of counsel is presently a matter of continuing "evolution" in this circuit. *See Cooper v. Fitzharris,* 551 F.2d 1162 (9th Cir. 1977), *rehearing en banc granted,* No. 74–2998 (June 28, 1977); *Maryland v. Marzallo,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978) (White, J., dissenting from denial of a petition for a writ of *certiorari*). The Court of Appeals has applied various tests, ranging from the traditional inquiry into whether or not the trial constituted a "farce, sham, or mockery of justice," *United States v. Stern,* 519 F.2d 521, 524 (9th Cir. 1975), *cert. denied,* 423 U.S. 1033, 96 S.Ct. 565, 46 L.Ed.2d 407 (1975), to a more stringent examination of whether reasonably effective assistance was actually rendered. *Cooper v. Fitzharris, supra,* 551 F.2d at 1166. This latter, most demanding standard has been summarized as follows:

"[T]he role of the District Court presented under allegations of ineffective assistance of counsel is not to pass upon

tion that the primary purpose for monitoring and recording her visiting room conversations was not the security considerations. Lieutenant Goed admitted to several purposes behind this action (T. 1711–12), and Sheriff McDonald testified that

[W]e were keeping rather detailed information about Patricia Hearst while she was in our custody for anyone's information, *trial purposes* or anything that comes up in the future about her while she was in our custody. * * * We were keeping all information as a matter of record.

(T. 1703) (emphasis added). Finally, the delivery of the tapes to the F.B.I. upon a deter-

mination by jail officials that there was no information on the tapes vital to jail house security, undermines any contention that the monitoring and recording of the conversations with friends and family was ever motivated by security interests. At the very least, jail security is certainly not a plausible reason for turning the tapes over to the prosecution *after* it was determined that they contained no information of relevance to jail security." (Footnote omitted.)

These passages present, in nearly identical form, the arguments petitioner seeks now to press upon this Court.

the merits of the action not taken but to determine whether, under the particular facts and circumstances of the case, trial counsel failed to render reasonably effective assistance." *Id.* at 1166.[19]

Each of the several standards employed requires a thorough review of all the facts and circumstances of the case. In the instant case, such a review, even when conducted under the exacting standard of *Cooper v. Fitzharris,* demonstrates the frivolous nature of defendant's allegations as to the adequacy of her counsel. The exhaustive efforts expended on her behalf in the course of the proceedings serve to expose petitioner's specific complaints as speculative, unfounded assertions completely unwarranted by the record.

When defendant was first taken into custody on September 18, 1975, she employed Mr. Terence Hallinan as counsel. Mr. Hallinan handled the early proceedings in the case, including defendant's arraignment and several bail reduction hearings. Shortly thereafter, on October 2, defendant substituted as counsel Mr. F. Lee Bailey and his associates, Mr. J. Albert Johnson and Mr. Thomas J. May. Mr. Bailey is a trial lawyer of considerable experience, well-known not only in his home state of Massachusetts, but in many other American jurisdictions as well. He has appeared before the Supreme Court of the United States and has authored a number of books on the subject of criminal defense.[20] In all, the defense team consisted of five attorneys and a full time investigator.[21]

A reexamination of proceedings held prior to trial discloses a record of vigorous and thorough preparation by the defense. More than twenty major motions were presented for consideration by the trial court. The pursuit of discovery was aggressive, and included motions for complete access to all government files, for the names and addresses of all government witnesses, for the identities of all experts known to the government who could testify as to the collateral effects of kidnapping, for production of all defendant's statements in the hands of the government, for production of the grand jury transcripts, for production of all materials obtained through electronic surveillance, and finally, for the production of all *Brady* materials. *United States v. Hearst,* 412 F.Supp. 863 (N.D.Cal.1975). The fruits of these discovery efforts were voluminous—this Court has previously characterized the production resulting from the *Brady* request alone as "massive materials, including reports, records, documents, and all of defendant's known statements in the government's possession."[22] *United States v. Hearst,* 424 F.Supp. 307, 310 (N.D.Cal. 1976).

As well, the record discloses that the defense challenged, prior to trial, the admissibility of major pieces of evidence in the government's case, including evidence of crimes committed subsequent to the armed robbery at the Hibernia Bank, defendant's incriminating statements made on tape and to various prosecution witnesses, the Tobin tape, and evidence discovered in a search pursuant to the arrest of William and Emily Harris. *See United States v. Hearst,* 412 F.Supp. 880 (N.D.Cal.1976); *United States v. Hearst,* 412 F.Supp. 888 (N.D.Cal.1976);

19. Although the decision in *Cooper v. Fitzharris,* 551 F.2d 1162 (9th Cir. 1977), has been vacated, and a rehearing *en banc* granted, No. 74–2998 (June 28, 1977), application of this most severe standard will serve to insure the fullest possible consideration of petitioner's contentions.

20. *See, e. g.,* Bailey and Greenya, For The Defense (1975); Aronson and Bailey, The Defense Never Rests (1971); Bailey and Rothblatt, Investigation and Preparation of Criminal Cases, Federal and State (1970); Complete Manual of Criminal Forms, Federal and State (1968).

21. In addition to Bailey, Johnson, and May, the defense team included Mr. Henry Gonzales and Mr. E. John Kleines, an attorney associated with the Hearst family. Mr. John McNally, a private investigator from New York City, was also retained to assist in the preparation of the defense.

22. The FBI reports furnished to defendant under discovery requests totalled 3,300 pages; a complete set of documents seized at the time of arrest numbered an additional 1,200 pages. *United States v. Hearst,* 424 F.Supp. 307, 310 (N.D.Cal.1976).

*United States v. Hearst,* 412 F.Supp. 891 (N.D.Cal.1976). In conjunction with these efforts, the defense sought to limit the government's cross-examination of Ms. Hearst to events immediately surrounding the bank robbery itself. *United States v. Hearst,* 412 F.Supp. 885 (N.D.Cal.1976).

Ms. Hearst's defense was conducted no less vigorously at trial. The extensive *voir dire,* which proceeded *in camera* at the request of defense counsel, has been described above in detail. During the trial itself, despite defense efforts to remove key elements from the government's case, and to discredit its witnesses,[23] the material presented by the prosecution was formidable indeed. This Court has previously described the evidence of defendant's voluntariness as "massive," for it included:

> "the verve and alacrity of defendant's movements during the bank robbery (vividly captured on film); the apparent sincerity of her revolutionary taped messages * * *; defendant's matter-of-fact statements to witness Matthews that her role in the robbery had been voluntary * * *; indications on cross-examination of defendant that she enjoyed relative freedom during her alleged 'captivity'; SLA documents chronicling revolutionary escapades, a major portion of which defendant admitted having written; the admitted clenched fist salutes given by defendant after her arrest; defendant's utterance of revolutionary slogans to her friend Trish Tobin in jail; * * *." *United States v. Hearst,* 424 F.Supp. 307, 317 (N.D.Cal.1976).

Faced with a virtual avalanche of evidence, the defense case was impressively conducted. Over the course of twelve days, covering some sixteen hundred pages of transcript, fourteen defense witnesses, including four experts, were presented to the jury. The theory of the defense, and defendant Hearst's extensive testimony in support thereof, have been previously set forth. At the conclusion of the trial, Judge Carter acknowledged the considerable efforts by counsel for both sides.[24]

With the acuity of vision that regularly comes with hindsight, petitioner now claims that trial counsel failed to provide effective assistance in her defense. The Court will consider each of her specific complaints.

### B.

Petitioner first contends that conflicts of interest which allegedly beset trial counsel rendered his representation ineffective. She advances three allegations: (1) that counsel's contract to write a book about her trial created an inherent conflict between the goals of counsel and the interests of petitioner; (2) that counsel's position as a well-known author and speaker required that he surround the trial with as much publicity as possible, contrary to defendant's best interests, and (3) that various of counsel's business commitments rendered him too weary to conduct an adequate defense.

 The Sixth Amendment requires that the services of an attorney be devoted solely to the interests of his or her client. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The pressure of conflicting loyalties, particularly those which involve financial interests outside the representation itself, may render suspect

---

**23.** Defense efforts to impeach government witnesses were extensive. Mr. Bailey's cross-examination of Dr. Joel Fort alone extended over a three-day period. In addition, rebuttal witnesses were presented by the defense in an attempt to impeach the testimony of the government's chief psychiatric experts, Dr. Fort and Dr. Kozol.

**24.** Judge Carter made the following remarks:
"As to the lawyers * * * in this case: I always start the case with a prayer that good lawyers be sent to the courtroom, and may I say to you that I have had the representation of skilled counsel from both sides who have done their literal best to present this evidence as they saw it.

It has not been an easy proposition. I understand the trial problem, because I was a trial lawyer for a considerable period of time and lived in a trial lawyer's family. You gentlemen performed with honor and in accordance with the high calling which you have accepted as your station in life." R.T. 4582.

the adequacy of the lawyer's performance. *United States v. Hurt,* 177 U.S.App.D.C. 15, 19, 543 F.2d 162, 166 (1976); ABA Code of Professional Responsibility, Canon 5. In keeping with this concern, the acquisition by defense counsel, prior to the conclusion of the representation, of literary or dramatic rights to the client's "story," is a practice which deserves judicial condemnation. *Wojtowicz v. United States,* 550 F.2d 786, 793 (2d Cir. 1977); *People v. Corona,* 80 Cal. App.3d 684, 720, 145 Cal.Rptr. 894, 915 (1978). The ABA Code of Professional Responsibility renders such conduct, where proven, the object of disciplinary proceedings. *Id.,* DR 5–104(B). This is properly so, for counsel's obligation to provide an effective defense to the accused is too important to suffer the possibility that divergent financial interests will diminish the rigor of the representation.

 Distasteful as the practice may be, however, it is not the case that the mere existence of a publication rights contract renders the representation constitutionally deficient. In this circuit, the well-established rule is that to prevail on a claim of conflict of interest, defendant must demonstrate that *actual prejudice* resulted from the alleged conflict. *United States v. Kutas,* 542 F.2d 527, 529 (9th Cir. 1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 810, 50 L.Ed.2d 790 (1977); *United States v. Eaglin,* 571 F.2d 1069, 1086 (9th Cir. 1977). And although such claims have arisen most frequently in connection with dual representation of co-defendants, the same rule has been applied in circumstances involving publication rights arrangements. *Wojtowicz v. United States, supra; Ray v. Rose,* 535 F.2d 966, 974 (6th Cir. 1976), *cert. denied,* 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976); *People v. Corona, supra.*

 Under this standard, none of petitioner's allegations as to Mr. Bailey's alleged conflicts are sufficient to state a claim for relief. With respect to the book contract, defendant has not even made a colorable claim of actual prejudice to her defense. Her principal contention appears to be that, in order to remove vast areas of her story from the attorney-client privilege, and to heighten public attention to her trial, defense counsel demanded that she take the stand to testify, even though he realized that her repeated invocations of the Fifth Amendment would ultimately doom her cause. The record does not support this fanciful version of the facts, for, as the Court of Appeals has previously observed, the overwhelming evidence of guilt presented by the government rendered defendant's testimony a reasonable, if not obligatory, tactical choice:

"The government presented a strong case against appellant. It introduced undisputed evidence that she had participated in the bank robbery. Since bank robbery is a crime requiring only a general intent, the jury could have inferred the requisite intent from the very commission of the act. [citations omitted] Appellant's only hope was to testify about her role in the robbery. She could not have relied solely on the testimony of her expert witnesses, for the government presented an impressive array of psychiatric testimony disputing appellant's claim that she had participated involuntarily in the robbery. We believe that appellant would have testified even if the trial court had ruled at the beginning of the trial that her privilege against self-incrimination was subject to waiver." *United States v. Hearst, supra,* 563 F.2d at 1343–1344.

In addition, defendant's application discloses that both she and her family were fully aware, prior to trial, that Bailey was contemplating a publication rights contract. Although such knowledge may fall short of a waiver of any objection to the arrangement, it is a factor which casts a pallor of insincerity over defendant's belated contentions.

Substantially the same can be said of petitioner's other allegations of conflict. If Bailey's busy schedule left him too fatigued to attend the trial, the record does not disclose it. His participation appears to have been alert and attentive at all times. And even had counsel over-extended himself, qualified co-counsel were in attendance

throughout the trial.[25] As well, defendant provides no specifics as to the means by which Bailey attempted to generate publicity for the trial (other than his decisions to put defendant on the stand, and to waive objections to venue, tactical choices which are discussed elsewhere in this Opinion). Indeed, the Court is quite certain that the tremendous public attention given the trial would have existed even in Bailey's absence.

The authorities relied upon by defendant are such a far cry from this case as barely to merit discussion. In *People v. Corona, supra,* in which a California appellate court found a publication rights contract to be improper, the facts supporting the existence of actual prejudice were overwhelming. Defense counsel failed to explore clearly relevant and substantial defenses, resisted the trial court's attempts to secure psychiatric examinations which were obviously appropriate, committed gross errors of law, and participated openly in attempts to generate publicity for the trial. The court summed up counsel's performance as follows:

"Despite the aforestated wide ranging and elaborately woven web of circumstantial evidence connecting appellant to the crimes and unerringly pointing to his participation in their commission, trial counsel for appellant failed to raise the obvious alternative defenses of mental incompetence * * * and/or diminished capacity and/or legal insanity * * *. Still worse, trial counsel failed to present any meaningful defense at all. After a lengthy trial, lasting several months, in which the prosecution produced more than 100 lay and expert witnesses and put in an immense wealth of documentary evidence, defense counsel failed to call a single witness on his client's behalf, and submitted the case basically upon the evidence produced by the prosecution. After a relatively short deliberation, lasting approximately five days, the jury brought

in its verdicts finding appellant guilty of first degree murder on all 25 counts charged." *Id.,* 80 Cal.App.3d at 702, 145 Cal.Rptr. at 903 (citations and footnotes omitted).

This shocking dereliction of duty stands in sharp contrast to the exhaustive efforts, recounted above, made on behalf of Ms. Hearst. In like manner, the other cases relied upon by the petitioner involved far more obvious conflicts of interest which resulted in acute, demonstrable prejudice. *See MacKenna v. Ellis,* 280 F.2d 592 (5th Cir. 1960) (inexperienced defense counsel who had application for employment pending with the district attorney, accommodated state's request for an expedited trial, and, as a result, presented only a "half-hearted defense"; *Wilson v. Phend,* 417 F.2d 1197 (7th Cir. 1969) (defense counsel, who owned local newspaper which carried extensive accounts of trial, changed defendant's plea to one of insanity without consultation with defendant, failed to present alibi witnesses on defendant's behalf, and failed to move for new trial); *United States v. Hurt, supra* (appellate counsel, having been sued by defendant's former trial counsel for pressing inadequacy of counsel claims on appeal, sought several times to be excused from case, and proceeded to represent defendant only under threat of contempt). These authorities provide no support whatsoever to petitioner's contentions. Having failed to assert any facts which could demonstrate actual prejudice to her case, petitioner can obtain no relief from the conflicts of interest she has alleged.

## C.

The majority of petitioner's remaining claims express a common theme: that defense counsel failed to investigate properly the facts and/or law relative to various defenses and strategies, and, as a result, made decisions uneducated by relevant factual and legal considerations. To such defi-

---

**25.** Petitioner argues, in her reply memorandum, that Bailey delegated excessive responsibility for her defense to other members of the defense team. However, such an allegation is irrelevant, for petitioner has not even suggested that these attorneys were other than qualified, competent counsel.

ciencies, defendant attributes: (1) counsel's alleged failure to present meritorious arguments in support of defendant's motion to suppress the Tobin tape; (2) the decision to place defendant upon the stand to testify; (3) counsel's failure to raise "involuntary drug ingestion" as a defense to the charges; and (4) the failure to move for a change of venue to counter the adverse effects of pretrial publicity.

██ The Sixth Amendment requires that counsel not only provide effective representation at trial, but also that appropriate investigation, both factual and legal, be made to insure that all available defenses will be explored and considered. *Brubaker v. Dickson,* 310 F.2d 30, 38 (9th Cir. 1962); *United States v. DeCoster,* 159 U.S.App. D.C. 326, 333, 487 F.2d 1197, 1204 (1973). Important decisions to withdraw crucial defenses, or to waive the assertion of clear legal rights, will render representation inadequate if made without the benefit of necessary factual and legal research. *People v. Corona, supra,* 80 Cal.App.3d at 705, 145 Cal.Rptr. at 905.

██ However, counsel are not required to exhaust every possible lead, no matter how speculative or insubstantial. In *Cooper v. Fitzharris, supra,* the Ninth Circuit made clear that even the strictest standard by which counsel's conduct is to be measured

> "does not mean that [the court] should second guess reasoned choices between trial tactics nor does it mean that defense counsel, to protect himself against allegations of inadequacy, must make every conceivable motion no matter how remote the possibilities are of success. It is sufficient if he is prepared and conducts the defense with reasonable knowledge and skill with an exercise of knowledgeable choices of trial tactics." *Id.* at 1166.

In addition, it has long been understood that "[where] counsel otherwise perform in a fully competent manner, a choice of trial tactics * * * can rarely be said to rise to the level of a deprivation of a constitutional right." *Mengarelli v. United States,* 476 F.2d 617, 619 (9th Cir. 1973).

Those cases relied upon by petitioner which find representation inadequate on grounds of insufficient research or investigation share two common features. First, the existence of relevant facts which counsel failed to develop was obvious, and the facts themselves unquestionably relevant to the defense. In *Brubaker v. Dickson, supra,* for example, defendant was charged with first degree murder. His appointed counsel, after having spent a total of one hour with defendant in pretrial preparation, failed to raise any defenses going to defendant's mental competency. The Court of Appeals summarized the information available to counsel suggesting the existence of such a defense:

> "Electroencephalographic (EEG) examinations made subsequent to appellant's conviction revealed organic brain damage. His prior medical history contained episodes of head injury and infantile illness from which the brain damage could have resulted; there were no such incidents subsequent to the homicides. Medical opinion indicated that the damage was such as to render appellant 'definitely seizure prone'; and was 'of a type often associated with abnormal and otherwise unexplainable conduct.' There was psychiatric opinion based upon post-conviction evaluations that appellant, while not 'insane,' had a compulsive personality marked by strong emotional instability. There was substantial evidence of hypersensitivity to alcohol; and the record established that immediately prior to the homicides appellant had drunk heavily. There was competent medical opinion to support the view that, in the light of these and other factors, appellant was incapable of entertaining the specific intent required for first-degree murder at the time and in the circumstances of the homicides." *Id.* at 33 (footnotes omitted).

Similarly, the court in *People v. Corona, supra,* 80 Cal.App.3d at 706–709, 145 Cal. Rptr. at 906–908, noted the existence of overwhelming facts, completely ignored by counsel, which pointed to the clear availability of defenses based upon the mental condition of the defendant.

■ Second, in none of the cases relied upon by defendant did the failure to investigate extend merely to a single element in an otherwise well-litigated matter; rather, the constitutional defect was the failure to investigate *any* facts, resulting in the inability to present any defense whatsoever on behalf of the accused. *See Brubaker v. Dickson, supra, United States v. DeCoster, supra.* Illustrative is *Wilson v. Rose,* 366 F.2d 611 (9th Cir. 1966), in which the court found that counsel's failure to inform himself as to the facts and law of the case resulted in a denial of defendant's Sixth Amendment rights. Counsel's performance was summarized as follows:

> "Throughout all this period * * * counsel for the accused failed in any real sense to advise and consult with the accused; failed to discuss possible defenses or the facts of the case with the accused; failed to pursue any discovery devices available; failed to investigate the case or interview witnesses; and failed to advise the accused of the nature and consequences of a guilty plea. Counsel not only failed to advise the accused that a guilty plea might result in a prison sentence, but unequivocally assured the accused that he would be granted probation." *Id.* at 613–614 (footnote omitted).

Therefore, petitioner cannot prevail upon a showing of merely erroneous tactical or strategic decisions, but must demonstrate a failure by counsel to inquire into matters plainly relevant and substantial to her defense. Based upon these principles, none of petitioner's several allegations are sufficient to constitute a basis for relief.

Petitioner's attack on defense counsel's treatment of the motion to dismiss the Tobin tape concentrates upon two areas: (1) an allegedly incomplete and poorly-researched memorandum filed in support of the motion; and (2) a chronicle of "evidence," not introduced at trial, which petitioner claims would show that the taping was conducted for unconstitutional purposes.[26] Little more need be said on this topic, for the extensive proceedings relative to the tape are detailed above. *See* III, *supra.* The record itself discloses substantial efforts to pursue this matter, including the taking of testimony at an evidentiary hearing, argument to the trial court, and briefing and reargument in the Court of Appeals. Moreover, nothing can turn on the form of a single memorandum submitted in the course of this lengthy proceeding—it should be obvious that given the pressing demands upon counsel during the pretrial period, and the tremendous discovery material requiring examination (*See* IV, A, n.22, *supra*), not every document submitted can be an exhaustive summary of the law. What is important is that the issues be investigated and presented to the trial court in a competent manner—this much was certainly accomplished here.

Petitioner also challenges counsel's decision to have her testify, claiming: (1) that the decision was based upon clearly erroneous assumptions about the law governing the scope of the government's cross-examination of her testimony; and (2) that her testimony was superfluous to her defense and should therefore not have been presented. However, because the Court concurs in the express ruling of the Court of Appeals that this decision constituted a deliberate, tactical choice by counsel, it cannot provide a basis for review here. *Cooper v. Fitzharris, supra.* Furthermore, as previously noted, the compelling evidence educed by the prosecution rendered defendant's presence on the witness stand a necessary—if not essential—element of her defense. *See United States v. Hearst, supra,* 563 F.2d at 1343–1344.

Petitioner next charges that defense counsel failed to investigate facts which, if properly developed, would have provided her with a further defense to the robbery; to wit, that she had unknowingly ingested mind-altering drugs during her captivity.

**26.** To the extent that such "evidence" is based upon information disclosed in *In re Delancie v. McDonald,* Superior Court of San Mateo County, Doc. No. 207385, a state court action commenced nearly two years after the conclusion of petitioner's trial, the Court is unable to understand how defense counsel could possibly have had access to such material.

In an affidavit submitted as part of this application, Mr. Vincent Hallinan alleges, in substance, that shortly after the petitioner's arrest, he spoke with an inmate of the California Medical Facility at Vacaville, who purported to have spoken at some earlier time with Donald DeFreeze (one of Ms. Hearst's kidnappers). DeFreeze, who was dead by the time of petitioner's arrest, is alleged to have told Jefferson that he was familiar with indoctrination programs utilizing both stress treatment and drugs, and that he intended to carry out such a program on the child of a wealthy American family. Petitioner claims that such facts merited further investigation which was not performed, thereby resulting in a forfeiture of the defense.

Such allegations, even if proven, do not entitle petitioner to relief. The Court regards the existence of this "defense," at least as set forth in the Hallinan affidavit, as extremely speculative at best. Hallinan states that he spoke with a prison inmate, who had allegedly spoken to another inmate, since deceased, who told him, not of facts then in existence, but only contemplated for the future. This is hardly the kind of obvious factual material which the Sixth Amendment compels counsel to pursue. Second, the bail affidavit executed by petitioner on September 22, 1975, in which she hinted at the use of drugs, was later thoroughly discredited by her testimony at trial. R.T. 1496–1506. Most importantly, none of the many reports prepared by various psychiatric experts who examined defendant prior to trial—clearly the most probative evidence to which counsel could look to ascertain the potential for a drug-related defense—suggest even the likelihood that drug ingestion may have explained petitioner's behavior.[27] Under these circumstances, nothing presented by petitioner could support a finding that counsel was derelict in

this regard, even were it established that no investigation was conducted into this area.

Counsel is further criticized for having failed to undertake inquiries into the prejudicial nature of pretrial publicity, and for neglecting to present facts bearing thereon to the trial court. This claim, too, is without merit. First, as discussed above (*See* II, *supra*), counsel's decision to try the case in San Francisco was clearly a tactical choice, and therefore unreviewable here. Second, the extensive and thorough *voir dire* conducted at the insistence of counsel was more than sufficient to assure that petitioner's right to an impartial jury was preserved. In addition, it is unclear what petitioner would have had counsel "investigate" —the nature and extent of publicity were fairly obvious, and judgments as to popular sentiment are inherently speculative and inexact. The Constitution certainly does not require that professional surveys be ordered to determine whether the public climate in another jurisdiction is markedly better than that where the indictment was filed.

For these reasons, the Court finds petitioner's allegations of inadequate trial preparation on the part of her counsel clearly insufficient to entitle her to relief.

### D.

Petitioner's final contention is that because she was not privy to certain aspects of the trial and pretrial decision-making process, she has been denied effective assistance of counsel. In particular, she avers that the decision to try her case in San Francisco, despite extensive pretrial publicity, as well as the election to present her testimony, were made without her participation or consent.

---

**27.** The Court reviewed in detail each of the many medical and psychiatric reports held here under seal, including reports by Dr. Seymour Pollack, Dr. Louis Jolyon West, Dr. Margaret Singer, Dr. Donald T. Lunde, Dr. Barry R. Tharp, and Dr. William C. Fowkes, Jr. The reports are unanimous in stating that defendant did not recall the use of drugs during the two-year period prior to her arrest. Nor do any of the psychiatrists describe any symptoms which, in their view, are attributable to drug ingestion. Indeed, the report of Dr. Pollack asserts unequivocally that "there is no mental impairment due to brain damage, drugs, metabolic or physical disease."

However, petitioner is not entitled to attack such decisions here, for as noted above, the record reveals them to be the considered, tactical choices of defense counsel. It has been clear since *Henry v. Mississippi, supra,* that absent a showing of exceptional circumstances, the strategic decisions of competent trial counsel are binding, even when made without the express consent of the defendant. *Id.,* 379 U.S. at 451–452, 85 S.Ct. 564; *Estelle v. Williams,* 425 U.S. 501, 508 n. 3, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *Wainwright v. Sykes, supra,* 433 U.S. at 91 n. 14, 97 S.Ct. 2497. The record does not support a finding of "exceptional circumstances" with respect to petitioner's representation at trial, nor have any been urged upon the Court. Moreover, Ms. Hearst's obviously well-prepared testimony at trial renders it exceedingly unlikely that the decision to have her testify was thrust upon her in the eleventh hour. Finally, in light of counsel's unchallenged statement that more than one thousand hours were spent in consultation with the petitioner, it strains credibility to suggest that she was unaware of significant aspects of the defense strategy.

Under these circumstances, no evidentiary hearing is necessary to determine that petitioner's allegations of insufficient consultation by counsel can provide no basis whatsoever for relief.

### V.

None of petitioner's many claims are sufficient to require an evidentiary hearing to determine whether her sentence should be vacated or modified. Examined in detail, the contentions advanced in her lengthy petition are plainly without merit. Based upon its searching review of the entire record, the Court can only conclude that Ms. Hearst was afforded a trial which was both full and fair, conducted on her behalf by counsel whose assistance was adequate by all constitutional standards. Further, this Court is not persuaded that justice requires a reduction of her sentence. Accordingly, petitioner's motions, pursuant to 28 U.S.C. § 2255 and Rule 35 of the Federal Rules of Criminal Procedure, are DENIED.